# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| BAXANO SURGICAL, Inc., | ) |
| | ) Case No. 14-12545-CSS |
| Debtor. | ) |

## DISCLOSURE STATEMENT IN SUPPORT OF
## FIRST AMENDED CHAPTER 11 PLAN OF BAXANO SURGICAL, INC.

Robert Lapowsky
John Kilgannon
STEVENS & LEE
1818 Market Street, 29th Floor
Philadelphia, PA  19103
(215) 575-0100
rl@stevenslee.com
jck@stevenslee.com

and

John D. Demmy
STEVENS & LEE
1105 North Market Street, Suite 700
Wilmington, DE  19801
(302) 425-3308
jdd@stevenslee.com

Attorneys for the Debtor and Debtor-in-Possession

Dated:  June 2, 2015

Table of Contents

I.    INTRODUCTION ....................................................................................................3

II.   OVERVIEW OF CHAPTER 11.............................................................................9

III.  DESCRIPTION OF THE DEBTOR, ITS BUSINESS AND EVENTS LEADING
      CHAPTER 11 ..........................................................................................................9
      A.  Description of the Debtor, Its Business and Its Capital Structure ...................9
      B.  Events Leading to Chapter 11 ........................................................................10

IV.   SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE .................11
      A.  Appointment of Committee .............................................................................11
      B.  Retention of Professionals .............................................................................11
      C.  Retention of Tamarack....................................................................................11
      D.  DIP Financing and Use of Cash Collateral ...................................................11
      E.  Sale of Operating Assets ................................................................................12
      F.  Establishment of Proof of Claims Bar Dates .................................................12
      G.  Committee Challenge to Hercules Secured Claim and Global Settlement Stipulation ..13

V.    SUMMARY OF MAJOR TERMS OF PLAN ....................................................15
      A.  Effective Date .................................................................................................15
      B.  Treatment of Unclassified Allowed Administrative Claims and Priority Tax Claims ...15
      C.  Treatment of Classified Claims ......................................................................18

VI.   SELECTED DETAILS REGARDING IMPLEMENTATION OF PLAN ..........21
      A.  Liquidation Trust ............................................................................................21
      B.  Nonconsensual Confirmation..........................................................................23
      C.  Injunctions.......................................................................................................23
      D.  Releases............................................................................................................23
      E.  Exculpation ......................................................................................................24
      F.  Reserved...........................................................................................................24
      G.  No Discharge ...................................................................................................24
      H.  Potential Causes of Action..............................................................................24

VII.  LIQUIDATION ANALYSIS..................................................................................25

VIII. VOTING ON THE PLAN ......................................................................................25
      A.  Voting Procedures............................................................................................25

B.  Acceptance ..................................................................................................26

IX.  CRAM-DOWN ..................................................................................................26

A.  Unfair Discrimination ..................................................................................27

B.  Fair and Equitable Standard ..........................................................................27

X.  BEST INTERESTS TEST ..................................................................................27

XI.  FEASIBILITY ..................................................................................................29

XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....29

A.  Alternative Plan ..........................................................................................29

B.  Liquidation under Chapter 7 ..........................................................................29

XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..................................................................................................29

A.  Federal Income Tax Consequences to Debtor ..................................................29

XIV. SUMMARY, RECOMMENDATION, AND CONCLUSION ..........................................31

SL1 1369103v7 109188.00001

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"), Baxano Surgical, Inc., debtor and debtor-in-possession in the above Chapter 11 Case (the "Debtor") submits the following disclosure statement (the "Disclosure Statement") pursuant to Section 1125(b) of the Bankruptcy Code for use in the solicitation of votes on its First Amended Chapter 11 Plan (the "Plan"). A copy of the Plan accompanies this Disclosure Statement as **Exhibit A**. All capitalized terms used herein, unless otherwise provided, have the meanings set forth in Article I of the Plan.

## I.    INTRODUCTION

The purpose of this Disclosure Statement is to set forth information (a) regarding the Debtor and the Chapter 11 Case, (b) concerning the Plan and alternatives to the Plan, (c) advising the holders of Claims and Interests of their rights under the Plan and (d) assisting the holders of Claims in making an informed judgment regarding whether they should vote to accept or reject the Plan.

The Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on November 12, 2014 (the "Commencement Date"). By order dated _____, 2015 (the "Disclosure Statement Approval Order"), the Bankruptcy Court approved this Disclosure Statement, in accordance with Section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable creditor or investor typical of holders of Impaired Claims against the Debtor to make an informed judgment as to whether to accept or reject the Plan.

The Disclosure Statement Approval Order sets forth in detail the deadlines, procedures and instructions for filing objections to confirmation of the Plan, voting to accept or reject the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Please note that the hearing to confirm the Plan will be held on _____ at _____ (EDT) before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, U.S. Bankruptcy Court for the District of Delaware located at Courtroom #6, 824 North Market St., 5th Floor, Wilmington, DE 19801.

Each holder of a Claim or Interest should read this Disclosure Statement, the Plan, the Disclosure Statement Approval Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN**. No solicitation of votes may be made except pursuant to this Disclosure Statement, the Disclosure Statement Approval Order and Section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims and Equity Interests should not rely on any information relating to the Debtor and its business, other than that contained in this Disclosure Statement, the Plan and all their respective exhibits and appendices.

The Debtor will file a plan supplement (the "Plan Supplement") as early as practicable but in no event fewer than 10 days prior to the Balloting Deadline, or on such other date as may be established by the Bankruptcy Court.  Parties may obtain a copy of the Plan and Plan Supplement (i) free of charge from counsel for the Debtor, John Demmy, (302)-425-3308, jdd@stevenslee.com (ii) free of charge at www.omnimgt.com/baxanosurgical; or (iii) for a fee via PACER at http://www.deb.uscourts.gov.

The Plan is a liquidating plan based, in part, on the terms of the Global Settlement Stipulation (defined in Section IV(G) below) among the Debtor, the Committee and Hercules.[1] It provides for the vesting, on the Effective Date of the Plan, of all remaining assets of the Debtor in a Liquidation Trust, governed by a Liquidation Trust Agreement.

All of the Debtor's operating assets have been sold and the proceeds of those sales have been used to repay secured debt and pay (or escrow for future payment) Administrative Claims. The only assets remaining in the Debtor's estate are cash (approximately $15,000 as of the date hereof), accounts receivable (estimated to have a net collectable value, as of the date hereof, of approximately $672,000), rights to return of deposits and refund of unearned insurance premiums (estimated to have a collectable value, as of the date hereof, of approximately $45,000), escrows for professional fees (approximately $196,000 as of the date hereof), potential Causes of Action to recover preferential transfers (estimated to have a net collectable value, as of the date hereof, of approximately $30,000)[2], and certain other Causes of Action the value of which the Debtor is unable to estimate, including possible Causes of Action against the Debtor's current and/or former officers and directors.

Following the Effective Date, the Liquidation Trustee will evaluate potential avoidance actions and, to the extent viable avoidance actions are identified, will pursue applicable recoveries.  In addition, the Liquidation Trustee will liquidate the remaining accounts receivable, rights to return of deposits and refunds of unearned insurance premiums.  Last, assuming a law firm can be identified that is willing to undertake an investigation of the viability of any Causes of Action against current and/or former directors and officers (each, as applicable, a "D&O"), on terms acceptable to the Liquidation Trustee, such investigation will be undertaken.  And, if that investigation results in a determination by the Liquidation Trustee that viable Causes of Action exist against current and/or former directors and officers that can be pursued on a cost-effective basis, such Causes of Action will be pursued.  The Debtor has director and officer liability insurance providing aggregate maximum coverage of $25,000,000.

---

[1]  Additional information regarding the Global Settlement Stipulation is located in Section IV(G), below.

[2]  The Debtor has not done a detailed analysis of potential recoveries on avoidance actions. It is anticipated that, after the Effective Date, the Liquidation Trustee will conduct a detailed analysis. The estimate used in this analysis is based on the limited analysis done by the Debtor and is intended to be conservative and not as an admission by the Debtor as to the validity or non-validity of any avoidance actions which may be pursued.

SL1 1369103v7 109188.00001

The Committee's professionals reviewed the D&O Policies, the Debtor's public filings with the U.S. Securities and Exchange Commission, and certain of the Debtor's books and records from August 4, 2011 through August 6, 2014 consisting of minutes of meetings held by the Debtor's board of directors (and committees thereof) and presentations and reports that were provided to the Debtor's board of directors (and committees thereof).  The Committee did not pursue broader discovery of the Debtor's files because it anticipated the Debtor would want to review documents to determine if they were subject to a claim of privilege.  It was contemplated that the Liquidation Trustee would step into the Debtor's shoes and control all privileges, thereby obviating any privilege review or privilege claim and any expense and delay associated with privilege review.  The Committee's professionals conducted certain legal research regarding potential bases for D&O Causes of Action.  The Committee's professionals concluded that there may be issues surrounding the acts and omissions of the Debtor's directors and officers at time the Debtor was seeking to raise significant amounts of capital in 2013 and 2014.  Such conclusion is a very preliminary and based on a relatively limited review and analysis.  Only the Liquidation Trustee will have the authority to decide whether pursue any D&O Causes of Action.  That decision is expected to be influenced by the willingness (or not) of competent counsel to undertake the pursuit of such claims on a contingent fee basis.

**THERE IS NO CERTAINTY THAT ANY VIABLE CLAIMS EXIST AGAINST ANY CURRENT OR FORMER DIRECTOR OR OFFICER.  ABSENT THE PURSUIT OF SUCH CLAIMS AND THE REALIZATION OF RECOVERIES, IT IS HIGHLY UNLIKELY THAT THERE WILL BE ANY DISTRIBUTIONS TO HOLDERS OF GENERAL UNSECURED CLAIMS.  THE LIQUIDATION TRUSTEE WILL DECIDE WHETHER TO PURSUE ANY CAUSES OF ACTION, INCLUDING CAUSES OF ACTION AGAINST ANY CURRENT OF FORMER DIRECTOR OR OFFICER, AND HIS DECISION WILL NOT BE SUBJECT TO THE OVERSIGHT OF ANY OTHER PERSON OR ENTITY.**  The Liquidation Trustee, upon the liquidation or abandonment of the remaining assets vested with the Liquidation Trust and payment of all expenses incurred by the Liquidation Trustee in the administration of the Liquidation Trust, will distribute the proceeds from such liquidation to the holders of Allowed Claims in order of the priorities set forth in the Plan.

The Plan further provides for the termination of all Interests in the Debtor and the deemed dissolution of the Debtor from and after the Effective Date of the Plan.

Below is a chart which, for each Class of Claims and Interests and for each type of unclassified Claim (a) reflects the Debtor's most recent estimates of the amount of such Claims which will ultimately be Allowed, (b) describes the treatment of the Claims under the Plan, (c) states whether the Class is impaired and entitled to vote on the Plan, and (d) reflects the Debtor's most recent estimate of the projected percentage recovery by holders of such Claims.

SL1 1369103v7 109188.00001

| CLAIM | ESTIMATED TOTAL AMOUNT OF CLAIMS AS OF EFFECTIVE DATE | ENTITLED TO VOTE ON PLAN | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Unclassified Non-Deferred Professional Administrative Claims and Other Administrative Claims | $608,406[3] | No – Unclassified Claims are not entitled to vote on plans | 100% |
| Priority Tax Claims | $86,017[4] | No – Unclassified Claims are not entitled to vote on plans | 100% (absent voluntary exercise of Priority Tax Compromise Election, in which case – 50%) |
| Unclassified Deferred Administrative Claims | $300,000[5] | No – Unclassified Claims are not entitled to vote on plans | 0% – 100% |
| Class 1 – Other Priority Claims[6] | $105,000 | Yes – Impaired so entitled to vote on Plan | 100% (absent voluntary exercise of Other Priority Claim Compromise Election – in which case – 50%) |

---

[3]   Total includes $537,406 of Non-Deferred Professional Administrative Claims ($356,767 for Debtor's counsel and $180,639 for Committee Professionals) plus $46,000 on account of current and projected Administrative Claims of Rust Omni and plus $25,000 of other Administrative Claims (other than the $75,000 Administrative Claim of Hercules) anticipated to be owed on the Effective Date. Total does not include ordinary operating expenses the Debtor anticipates incurring and paying prior to the Effective Date.

[4]   Amounts based on Debtor's schedules, as amended, excluding disputed claims but increased for understatement of IRS claim, which is $61,723.84.

[5]   Estimate based on current billings and projected billings to Effective Date.

[6]   Amounts based on Debtor's schedules, as amended.

(6)

| CLAIM | ESTIMATED TOTAL AMOUNT OF CLAIMS AS OF EFFECTIVE DATE | ENTITLED TO VOTE ON PLAN | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 2 –Hercules Allowed Secured Claim | $52,000 minus any payments from 5/28/15 to the Effective Date on account of Non-Deferred Hercules Claim + $75,000 on account of Deferred Hercules Claim | Yes – Impaired so entitled to vote on Plan | 100% |
| Class 3 – General Unsecured Claims | $19,000,000[7] | Yes – Impaired so entitled to vote on Plan | 0% – 100% |
| Class 6 – Equity Interests | n/a | No – Deemed to reject the Plan so not entitled to vote on Plan | 0% |

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference should be made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtor under the Plan and will, upon the Effective Date of the Plan, be binding upon all holders of Claims against and Interests in the Debtor and against other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan,

---

[7] Amounts based on Debtor's schedules, as amended. The General Bar Date was May 18, 2015. The Debtor has not yet reconciled filed claims against scheduled claims. **IT IS POSSIBLE THAT, ONCE FILED CLAIMS ARE RECONCILED AGAINST SCHEDULED CLAIMS, THE AMOUNT STATED ABOVE WILL INCREASE.**

or any other operative document, the terms of the Plan and such other operative document are controlling.

      For your vote on the Plan to be counted, a Ballot containing your acceptance or rejection of the Plan must be received by the Debtor's Balloting Agent, Rust Consulting Omni Bankruptcy. ("Rust Omni"), at 5955 De Soto Avenue, Suite 100, Woodland Hills,, CA, 91367, no later than the Balloting Deadline (defined below) by first class U.S. mail or delivered by messenger or overnight courier. Ballots sent by facsimile, telecopy, or e-mail will not be accepted. **The deadline for voting on the Plan (the "Balloting Deadline") is _____ p.m. (Prevailing Pacific Time) (Prevailing Pacific Time) on _____, 2015**. Ballots received after the Balloting Deadline will not be counted or otherwise considered.

**THIS PLAN IS THE PRODUCT OF NEGOTIATIONS BETWEEN, AMONG OTHERS, THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE DEBTOR (THE "COMMITTEE"). THE COMMITTEE IS A FIDUCIARY APPOINTED BY THE OFFICE OF THE UNITED STATES TRUSTEE. THE COMMITTEE REPRESENTS THE COMMON INTERESTS OF ALL UNSECURED CREDITORS OF THE DEBTOR.**

**THE DEBTOR AND THE COMMITTEE STRONGLY URGE ACCEPTANCE OF THE PLAN AS BEING IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS. ACCORDINGLY, THE DEBTOR AND THE COMMITTEE URGE EACH CREDITOR THAT IS IMPAIRED UNDER AND ENTITLED TO VOTE WITH RESPECT TO THE PLAN TO VOTE TO ACCEPT THE PLAN.**

**IF CLASS 1 – OTHER PRIORITY CLAIMS, REJECTS THE PLAN, ABSENT AMENDMENT, THE PLAN CANNOT BE CONFIRMED.**

**NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS OR SCHEDULES ATTACHED HERETO. THE ACCURACY OF THE ACCOUNTING, FINANCIAL, ECONOMIC AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE EXCLUSIVE RESPONSIBILITY OF THE DEBTOR.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT AT ANY TIME AFTER THE DATE HEREOF SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN ANY CHANGE IN THE INFORMATION STATED HEREIN.**

**FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS**

REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE APPLICABLE AGREEMENTS.

## II.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code. However, it may also be used to effectuate an orderly liquidation of a debtor's business and assets.  In addition to permitting a debtor rehabilitation or liquidation, Chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy petition date.  Consummating a plan is the principal objective of a Chapter 11 case.  The confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  An order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan, as that treatment may be modified by the confirmation order.

Prior to soliciting acceptances of a proposed Chapter 11 plan, Section 1125 of the Bankruptcy Code requires that the plan proponent prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable creditor or investor to make an informed judgment regarding acceptance of the Chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of Section 1125 of the Bankruptcy Code.

## III.    DESCRIPTION OF THE DEBTOR, ITS BUSINESS AND EVENTS LEADING CHAPTER 11

### A.    Description of the Debtor, Its Business and Its Capital Structure

The Debtor was founded as a Delaware corporation in 2000 under the name "XiaMed, Inc." and later changed its name to "TranS1 Inc." in February 2003.  The Debtor changed its name from TranS1 Inc. to Baxano Surgical, Inc. following a merger between Baxano, Inc. and TranS1, Inc.

Prior to the sale of substantially all of its operating assets in the Chapter 11 Case (which happened at the end of January and beginning of February, 2015), the Debtor marketed a number of products for use by surgeons in performing minimally invasive spine surgery.

The Debtor funded operations, in part, with proceeds from the sale of publicly traded securities.  The Debtor has approximately 58 million outstanding common shares which were traded on the NASDAQ exchange under the symbol BAXS until shortly after the Commencement Date.

On December 3, 2013, the Debtor obtained a secured credit facility (the "Prepetition Credit Facility") from Hercules Technology Growth Capital, Inc. ("Hercules") to retire an existing credit facility and for general working capital purposes. The Prepetition Credit Facility was secured by first priority liens on substantially all the Debtor's property pursuant to the terms of a loan agreement (the "Prepetition Loan Agreement").

Pursuant to the Prepetition Loan Agreement, the Prepetition Lender agreed to fund up to $15,000,000 to the Debtor on an incremental basis. The Debtor received its first advance of $7,500,000 at Closing. Additional advances of $2,500,000 and $5,000,000, respectively, were to be made available when the Debtor reached certain financial benchmarks. The Debtor never reached those benchmarks and, as a result, neither the second nor the third advance was made.

On March 11, 2014, the Debtor entered into an agreement (the "Securities Purchase Agreement") pursuant to which certain institutional investors agreed to purchase $9,993,680 in unsecured subordinated convertible debentures. Closing on the Securities Purchase Agreement occurred on April 24, 2014.

On September 24, 2014, the Debtor obtained an unsecured bridge loan from one of the two institutional investors that participated in the Securities Purchase Agreement. The Debtor received $1.38 million in aggregate principal and issued similar subordinated convertible debentures.

## B.    Events Leading to Chapter 11

The Debtor has experienced significant losses since its inception. As of the end of August, 2014, the Debtor had an accumulated deficit of approximately $189 million, current assets of approximately $10.8 million, secured debt of $7.5 million and other debt totaling approximately $20 million. In 2013, the Debtor suffered a loss of approximately $32.03 million on revenues of approximately $18.58 million. Losses from operations have resulted principally from sales and marketing costs that have historically exceeded gross profit, costs incurred in research and development programs and from general and administrative expenses, including significant costs associated with establishing and maintaining intellectual property rights.

As a result of the foregoing, in the late summer of 2014, the Debtor concluded that it was not a viable stand-alone business. On September 9, 2014, the Debtor employed Houlihan Lokey Capital, Inc. ("Houlihan") to assist in, among other things, the Debtor's search for a buyer or buyers. Unfortunately, by November, 2014, the Debtor still had not identified a buyer or buyers for its business and was running out of cash with which to maintain operations while sale efforts continued. And, while Hercules was willing to continue to support the Debtor with some additional loans, it was unwilling to do so outside of a bankruptcy proceeding. As a result, the Chapter 11 Case was filed on the Commencement Date.

## IV.   SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE

As noted, the Debtor filed it petition for relief on the Commencement Date, November 12, 2014.  Thereafter, the following significant events occurred.

### A.    Appointment of Committee

On November 24, 2014, the United States Trustee filed a notice of appointment of the Committee pursuant to Section 1102(a)(1) of the Bankruptcy Code [D.I. 80].  Current members of the Committee are:

1.  Sabby Healthcare Volatility Master Fund, Ltd.

2.  DAFNA LifeScience LP.

3.  Pacific Instruments Inc.

### B.    Retention of Professionals

1.  Debtor's Professionals.

By orders of the Bankruptcy Court, dated December 15, 2014, the Debtor was authorized to retain Stevens & Lee, P.C ("Stevens & Lee") as counsel to the Debtor [D.I. 153] and Houlihan as financial advisor and investment banker to the Debtor [D.I. 177].  Also by order of the Court, dated November 21, 2014, the Debtor was authorized to retain Rust Omni as Claims and Noticing Agent for the Debtor [D.I. 62].

2.  Committee's Professionals.

By orders of the Bankruptcy Court, dated January 29, 2015, the Committee was authorized to retain Pillsbury Winthrop Shaw Pittman, LLP ("Pillsbury") ("Pillsbury") as counsel to the Committee [D.I. 2670], Morris Nichols Arsht, Tunnell ("Morris Nichols") ("Morris Nichols") as co-counsel to the Committee [D.I. 268], and Urbanowitz Consulting, LLC as consultant to the Committee (D.I. 270].

### C.    Retention of Tamarack

By order of the Bankruptcy Court dated December 12, 2014 [D.I. 146] (the "Original Tamarack Order"), the Debtor was authorized to enter into an agreement with Tamarack Associates, Inc. ("Tamarack") pursuant to which, among other things, Tamarack provided John L. Palmer ("Palmer") as Chief Restructuring Officer.  By order of the Bankruptcy Court dated March 27, 2015 [D.I. 382], the Original Tamarack Order was modified to allow Palmer also to be appointed as the Chief Executive Officer of the Debtor.

### D.    DIP Financing and Use of Cash Collateral

By order of the Bankruptcy Court dated November 18, 2014 [D.I. 33] (the "First Interim DIP/Cash Collateral Order"), the Debtor was authorized to obtain debtor-in-possession financing

(11)

and use cash collateral on an interim basis.  By order of the Bankruptcy Court dated December 12, 2014 [D.I. 144] (the "Second Interim DIP/Cash Collateral Order"), the Debtor was authorized to continue to obtain debtor-in-possession financing and continue to use cash collateral on an interim basis.  By order of the Bankruptcy Court dated December 22, 2014 [D.I. 176] (the "Final DIP/Cash Collateral Order"), the Debtor was authorized to obtain debtor-in-possession financing and use cash collateral on a final basis through February 1, 2105. The Final DIP/Cash Collateral Order has been modified on three occasions, most recently by an order (the "March Cash Collateral Modification Order") dated March 30, 2015 [D.I. 384]. Pursuant to the March Cash Collateral Modification Order, (a) the Debtor no longer is authorized to obtain debtor-in-possession financing (because none is needed), and (b) the Debtor is authorized to use cash collateral through May 31, 2015.

### E.    Sale of Operating Assets

On November 19, 2014, the Debtor filed a motion (the "Sale Procedures Motion") [D.I. 43] pursuant to which, among other things, the Debtor requested authorization to sell substantially all of its assets pursuant to sale procedures described in the motion.  The assets offered for sale by the Debtor consisted of four primary product lines, (a) the iO product line, (b) the AxiaLIF product line, (c) the VEO product line, and (d) the Avance product line.  On December 12, 2014, the Bankruptcy Court entered an order (the "Sale Procedures Order") [D.I. 147] granting the Sale Procedures Motion.

On January 29, 2015, the Bankruptcy Court entered orders pursuant to which the following sales were approved:  (a) the iO product line and some ancillary assets to Exworks Capital Fund I, L.P. [D.I. 271], (b) the AxiaLIF product line to Quandary Medical, LLC [D.I. 274], (c) the VEO product line to Choice Spine, LP [D.I. 272] and (d) the Avance product line to City Surgical, LLC, [D.I. 273].  The gross sale proceeds realized by the Debtor from the four sales were $7,760,000.  The sale proceeds were distributed as follows:  (x) $6,991,189 (the "Hercules Sale Proceeds Paydown") to Hercules on account of Hercules' Claims under the Prepetition Loan Agreement (the "Hercules Prepetition Claims"), and (y) the balance to pay and establish escrows for certain accrued Administrative Claims, including $310,400 for a transaction fee and $50,000 for reimbursable expenses which, subject to allowance by the Bankruptcy Court, it was anticipated would be owed to Houlihan.[8]

### F.    Establishment of Proof of Claims Bar Dates

On March 24, 2015, the Court entered an order (the "General Bar Date Order") [D.I. 361] pursuant to which, among other things, May 18, 2015 at 4:00 p.m. (Eastern Time) (the "General Bar Date") was established as the deadline for filing proofs of claim by all parties in interest, including holders of government claims, asserting General Unsecured Claims, Priority Claims

---

[8]    Due to a mathematical error, the actual amount of the Houlihan transaction fee, subject to approval of the Bankruptcy Court, will be $311,400 rather than the $310,400 that was escrowed. In addition, the total expenses for which Houlihan has sought approval is $12,465.45. As a result, the escrow includes $36,534.55 in excess of the funds that will be needed to pay Houlihan in full, assuming allowance of its claims in the amounts requested.

(12)

and Administrative Claims arising under Section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Administrative Claims"). The General Bar Date does not apply to any Administrative Claims other than the 503(b)(9) Administrative Claims.

On April 24, 2015 the Court entered an Order [D.I. 428] (the "First Administrative Claims Bar Date Order") establishing May 28, 2015 (the "First Administrative Claims Bar Date") as the bar date for administrative claims incurred from the Petition Date through and including April 6, 2015, other than Administrative Claims which are Excluded Claims, as defined in the Primary Administrative Claims Bar Date Motion

On June 2, 2015 the Court entered an Order [D.I. 487] (the "Second Administrative Claims Bar Date Order") establishing June 30, 2015 (the "Second Administrative Claims Bar Date") as the bar date for administrative claims incurred from April 7, 2015 through and including May 31, 2015, other than Administrative Claims which are Excluded Claims, as defined in the Second Administrative Claims Bar Date Motion

Although the General Bar Date and the First Administrative Claims Bar Date have passed, the Debtor has not yet reconciled filed Claims with scheduled and otherwise anticipated Claims. As a result, (a) the Debtor has not yet Filed and prosecuted objections to Claims, and (b) it is possible that Claims in excess of those currently anticipated by the Debtor may ultimately be Allowed. If that were to occur, it could impact the ability of the Debtor to make the Distributions described herein.

## G. Committee Challenge to Hercules Secured Claim and Global Settlement Stipulation

Pursuant to the Final DIP/Cash Collateral Order, among other things, the Committee was granted the right to challenge the amount of the Hercules Prepetition Claims. On January 23, 2015, the Committee filed a complaint against Hercules (the "Original Committee Complaint") [D.I. 237]. On February 12, 2015, the Committee filed a second complaint (the "Amended Committee Complaint") [D.I.43, Adv. Pro. No. 15-50089]. In the Amended Committee Complaint, among other things, the Committee asserted that approximately $750,000 of the Hercules Prepetition Claims should be disallowed. Hercules disputed all of the allegations in the Original Committee Complaint and the Amended Committee Complaint.

On March 26, 2015, the Committee, Hercules and the Debtor entered into a stipulation (the "Global Settlement Stipulation") pursuant to which, subject to approval by the Bankruptcy Court, the parties agreed, among other things, to:

- Allow the remaining amount of the Hercules Prepetition Claims in the amount of $575,000 (the "Hercules Allowed Secured Claim"), which represents a reduction in the amount Hercules Prepetition Claims remaining after application of the Hercules Sale Proceeds Paydown, of about $200,000,

- Bifurcate the Hercules Allowed Secured Claim into the $500,000 Non-Deferred Hercules Claim and the $75,000 Deferred Hercules Claim,

(13)

- A termsheet outlining the primary terms of a plan of liquidation for the Debtor which Hercules agreed to support (the "Agreed Plan"),

- A formula for payment of the Non-Deferred Hercules Claim on a weekly basis from cash on hand, with the entire balance of the Non-Deferred Hercules Claim due on or before the Effective Date of the Agreed Plan,

- Deferral, under the Agreed Plan, of portions of the Professional Administrative Claims owed to counsel to the Debtor and counsel to the Committee (the "Deferred Professional Administrative Claims"), in an amount now estimated to be approximately $300,000. The Deferred Professional Administrative Claims and the Deferred Hercules Claims result in the ability to:

  - Confirm this Plan without payment in full on the Effective Date of the Deferred Professional Administrative Claims,

  - Pay, under this Plan, the Allowed Other Priority Claims and Allowed Priority Tax Claims prior to payment of the Deferred Hercules Claim and the Deferred Professional Administrative Claims notwithstanding that, in a Chapter 7 liquidation, the Deferred Hercules Claim and the Deferred Professional Administrative Claims would have priority over the Allowed Other Priority Claims and Allowed Priority Tax Claims,

  - To the extent the Liquidation Trust generates Recovery Funds (likely, recoveries on account of preference claims and claims against directors and officers of the Debtor) (a) the distribution of the first $1,000,000 of such Recovery Funds (after payment of Trust Expenses and Allowed Other Priority Claims and Allowed Priority Tax Claims) to holders of Allowed General Unsecured Claims prior to payment of the Deferred Hercules Claim and the Deferred Professional Administrative Claims, and (b) the sharing between the holders of the Allowed General Unsecured Claims and the holders of the Deferred Hercules Claim and the Deferred Professional Administrative Claims of Recovery Funds in excess of $1,000,000 notwithstanding, in each case, that, in a Chapter 7 liquidation, the Deferred Hercules Claim and the Deferred Professional Administrative Claims would have priority over the Allowed General Unsecured Claims[9], and

---

[9]    Distributions to holders of Allowed General Unsecured Claims from Recovery Funds is subject to the provisions of Sections 7.9 and  7.14 of the Plan which, respectively, excuse the Liquidation Trustee from the requirement to make Distributions of less than $50.00 on account of any Allowed Claim or to make Distributions to any holder of an Allowed General Unsecured Claim if the Liquidation Trustee determines that it is likely that amounts available for such Distributions will be insufficient to generate a recovery of at least 1% to holders of Allowed General Unsecured Claims.

- The treatment of the Deferred Hercules Claim on a *pari passu* and pro-rata basis with the Deferred Professional Administrative Claims.

On March 26, 2015, the Debtor, the Committee and Hercules Filed a joint motion (the "Global Settlement Approval Motion") [D.I. 374] pursuant to which they sought approval of the Global Settlement Stipulation. On April 14, 2015, the Bankruptcy Court entered an order (the "Global Settlement Approval Order") [D.I. 419] granting the Global Settlement Approval Motion. As a result, this Plan will be supported by Hercules.

## V.  SUMMARY OF MAJOR TERMS OF PLAN

This Section summarizes the major terms of the Plan. The Plan is attached to this Disclosure Statement. Parties are encouraged to review the Plan in its entirety for a full understanding of its provision and impact on Claims and Interests.

### A.  Effective Date

The Plan will become effective on the first Business Day which is after the following conditions have been satisfied or waived by the Debtor:

(a)  The Confirmation Order has been entered and become a Final Order;

(b)  No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Court shall be pending; and

(c)  The Liquidation Trust Agreement shall have been executed.

### B.  Treatment of Unclassified Allowed Administrative Claims and Priority Tax Claims

1.  Professional Administrative Claims.

The Debtor estimates that, as of the Effective Date, unpaid Professional Administrative Claims will total approximately $837,000. However, pursuant to the Global Settlement Stipulation, in order to facilitate the ability to confirm this Plan, counsel to the Debtor and counsel to the Committee have agreed to defer payment of a portion of that amount, being the Deferred Professional Administrative Claims, which the Debtor estimates will total approximately $300,000 as of the Effective Date.

The Non-Deferred Professional Administrative Claims outstanding as of the Effective Date (being the total unpaid Professional Administrative Claims minus the Deferred Professional Administrative Claims) shall be paid by the Liquidation Trustee from the Liquidation Trust Assets within ten (10) days after the entry of a Final Order approving such Professional Administrative Claims, or at such later time as may be agreed by the holder of each such Claim.

**The Debtor estimates that, as of the Effective Date, the Allowed Non-Deferred Professional Administrative Claims will total approximately $537,000.**

The Deferred Professional Administrative Claims shall be paid by the Liquidation Trustee as follows:

- In the event the Liquidation Trustee elects not to pursue any Causes of Action (other than Causes of Action relating to collection of accounts receivable, return of unearned insurance premiums and/or return of deposits), as soon as practicable following such determination, the Deferred Professional Administrative Expenses shall be paid, *pari passu* and pro-rata, with each other and with the Deferred Hercules Claim from Liquidation Trust Assets remaining after payment of all Trust Expenses and any remaining Allowed Priority Tax Claims and Allowed Other Priority Claims until an amount equal to the Deferred Professional Administrative Claims shall have been distributed to the holders thereof.

- In the event the Liquidation Trustee elects to pursue any Causes of Action (other than any Causes of Action relating to collection of accounts receivable, return of unearned insurance premiums and/or return of deposits), as soon as practicable after resolution of all such Causes of Action:

    - all Liquidation Trust Assets other than Recovery Funds, defined below, (the "Non-Recovery Funds") remaining after payment of all reasonable Trust Expenses and any remaining amounts of Allowed Priority Tax Claims, Allowed Other Priority Claims, Non-Deferred Hercules Claim and Non-Deferred Professional Administrative Claims (with such Trust Expenses and any remaining amounts of Allowed Priority Tax Claims, Allowed Other Priority Claims, Non-Deferred Hercules Claim and Non-Deferred Professional Administrative Claims to be paid first from Recovery Funds, to the extent such Recovery Funds exist at the time of payment, and otherwise from Non-Recovery Funds) shall be distributed to holders of Deferred Professional Administrative Claims *pari passu* and pro-rata with Distributions to Hercules on account of the Deferred Hercules Claim until an amount equal to the Deferred Professional Administrative Claims and the Deferred Hercules Claim shall have been distributed to the holders thereof, and;

    - to the extent the Non-Recovery Funds are insufficient to pay the Deferred Professional Administrative Claims in full, but provided the Liquidation Trustee has not made the 1% Distribution Determination pursuant to Section 7.14 of the Plan, fifty percent (50%) of all Liquidation Trust Assets generated by Causes of Action (other than Causes of Action relating to collection of accounts receivable, return of unearned insurance premiums and/or the return of deposits) (the "Recovery Funds") and remaining after payment of all reasonable Trust Expenses and any remaining amounts of Allowed Priority Tax Claims, Allowed Other Priority Claims, Non-Deferred Hercules Claim and Non-Deferred Professional Administrative Claims and after payment or reservation of a total of $1,000,000 (including any amounts distributed to holders of Allowed General Unsecured Claims from the Non-Recovery Funds) on account of Distributions to holders of Allowed General Unsecured Claims shall be distributed to holders of Deferred

(16)

Professional Administrative Claims *pari passu* and pro-rata with Distributions to Hercules on account of the Deferred Allowed Hercules Claim.

- to the extent the Non-Recovery Funds are insufficient to pay the Deferred Professional Administrative Claims and the Deferred Hercules Claim in full and the Liquidation Trustee has made the 1% Distribution Determination pursuant to Section 7.14 hereof, all Recovery Funds remaining after payment of all reasonable Trust Expenses and any remaining amounts of the Allowed Priority Tax Claims, Allowed Other Priority Claims, Non-Deferred Hercules Claim and Non-Deferred Professional Administrative Claims shall be distributed to holders of Deferred Professional Administrative Claims pari passu and pro rata with Distributions to Hercules on account of the Deferred Allowed Hercules Claim.

- The foregoing notwithstanding, the Liquidation Trustee shall have the power to reserve up to $50,000 in proceeds of Causes of Action unrelated to D&O Causes of Action to fund pursuit of D&O Causes of Action.

**The Debtor estimates that the Deferred Professional Administrative Claims will total approximately $300,000.**

2. U.S. Trustee Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Liquidating Trustee shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until the earliest of the Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

**The Debtor estimates that the United State Trustee fees accrued through the Effective Date will total approximately $6,825.**

3. Other Administrative Claims.

Each holder of an Allowed Administrative Claim (other than for Professional Administrative Claims and United States Trustee Fees) (the "Other Administrative Claims) will be paid in full, in Cash, on the latest of (i) the due date, (ii) if such Administrative Claim is disputed by the Liquidation Trustee and is not an Allowed Claim, thirty (30) days after entry of a Final Order of the Bankruptcy Court Allowing such Administrative Claim or, if such Administrative Claim is not disputed by the Liquidation Trustee and is an Allowed Claim, thirty (30) days after the Effective Date, and (iii) the date agreed to by the holder of such Administrative Claim.

**The Debtor estimates that Allowed Other Administrative Claims as of the Effective Date will total approximately $25,000.**

4. <u>Priority Tax Claims</u>.

Each holder of an Allowed Priority Tax Claim who does not make the Priority Tax Compromise Election shall receive from the Liquidating Trust Assets deferred payments of Cash, in the full amount of such Allowed Priority Tax Claim, payable in equal, annual principal installments beginning on the first anniversary of the Effective Date and ending on the earlier of the fifth anniversary of the Effective Date and the fifth Anniversary of the date of the assessment of such Allowed Priority Tax Claim, together with interest (payable quarterly in arrears) on the unpaid balance of such Allowed Priority Tax Claim, at an annual rate equal to 3.25%, which is the prime rate as reported in the Wall Street Journal as of April 15, 2015.  At the option of the Liquidation Trustee, any Allowed Priority Tax Claim may be paid earlier than the dates stated above, but not, absent the consent of the holder, earlier than payment in full of each Non-Deferred Professional Administrative Claim and the Non-Deferred Hercules Claim.

Each holder of an Allowed Priority Tax Claim who makes the Priority Tax Compromise Election shall receive as soon as reasonably practicable after the later of the Effective Date and the date of such election (but not, absent the consent of the holder, earlier than payment in full of each Non-Deferred Professional Administrative Claims and the Non-Deferred Hercules Claim) Cash in an amount equal to 50% of such Allowed Priority Tax Claim in full settlement of such Allowed Priority Tax Claim.

**The Debtor estimates that Allowed Priority Tax Claims will total approximately $86,000.**

**C.    Treatment of Classified Claims**

Under the Plan, Claims against and Interests in the Debtor are divided into different Classes as described below.  If the Plan is confirmed by the Court, on the Effective Date and on certain times thereafter as Claims are resolved, liquidated or otherwise Allowed, the Liquidation Trustee will make distributions in respect of the Classes of Claims as provided for in the Plan and as set forth below.

1. <u>Class 1:  Other Priority Claims</u>.

(i) *Classification*:  Class 1 consists of Allowed Other Priority Claims.

(ii) *Description*:  Other Priority Claims are Claims entitled to priority under Section 507(a) of the Bankruptcy Code, other than Administrative Claims and Priority Tax Claims.  They include priority employee wage and benefit Claims.

**The Debtor estimates that Allowed Other Priority Claims will total approximately $105,000.**

(iii) *Treatment*:  Each holder of an Allowed Other Priority Claim who does not make the Other Priority Claim Compromise Election shall receive from the Liquidating Trust Assets deferred payments of Cash, in the full amount of such Allowed Other Priority Claim, payable in equal, annual principal installments beginning on the first anniversary of the Effective Date and ending on the earlier of the sixth anniversary of the Effective Date and the sixth

(18)

Anniversary of the date of the assessment of such Allowed Priority Tax Claim, together with interest (payable annually in arrears with each principal payment) on the unpaid balance of such Allowed Other Priority Claim, at an annual rate equal to 3.25%, which is the prime rate as reported in the Wall Street Journal as of April 15, 2015.  At the option of the Liquidation Trustee, any Allowed Other Priority Claim may be paid earlier than the dates stated above but not, absent the consent of the holder, earlier than payment in full of each Non-Deferred Professional Administrative Claim and the Non-Deferred Hercules Claim.

Each holder of an Allowed Other Priority Claim who makes the Other Priority Claim Compromise Election shall receive as soon as reasonably practicable after the later of the Effective Date and the date such Claim becomes an Allowed Claim (but not, absent the consent of the holder, earlier than payment in full of each Non-Deferred Professional Administrative Claim and the Non-Deferred Hercules Claim) Cash in an amount equal to 50% of such Allowed Other Priority Claim in full settlement of such Allowed Other Priority Claim.

If Class 1 rejects the Plan, Section 1129(a)(9)(b) of the Bankruptcy Code requires that holders of Allowed Other Priority Claims be paid in full in cash on the Effective Date.  Because the Plan does not provide for such treatment, if Class 1 rejects the Plan, the Plan cannot be confirmed absent amendment to comply with such requirement, which amendment the Debtor believes would not be feasible absent additional voluntary concessions from holders of Allowed Administrative Claims.

(iv) *Voting*:  **The Claims in this Class are Impaired and thus the holders of Claims in this Class will be entitled to vote to accept or reject the Plan**.

2.  Class 2:  Hercules Allowed Secured Claim.

(i)  *Classification*:  Class 2 consists of the Hercules Allowed Secured Claim.

(ii)  *Description*:  Pursuant to the Global Settlement Approval Order, the Hercules Allowed Secured Claim is $575,000, of which $500,000 is the Non-Deferred Hercules Claim and $75,000 is the Deferred Hercules Claim.

**As of the Effective Date, the Deferred Hercules Claim will be $75,000.  Further, the Debtor believes that, before the Effective Date the Non-Deferred Hercules Claim will have been paid in full and, as a result, on the Effective Date the Non-Deferred Hercules Claim will total $0.**

(iii)  *Treatment*:  The Non-Deferred Hercules Claim shall be paid in full, in Cash from the Liquidating Trust Assets on the Effective Date.  The Deferred Hercules Claim shall be paid by the Liquidation Trustee *pari passu* and pro-rata with payment of the Deferred Professional Administrative Claims.  On the Effective Date, Hercules shall be deemed to have waived any and all Liens securing the Deferred Hercules Claim and, in return, the Deferred Hercules Claim shall be deemed to be an Allowed Administrative Claim.

(iv)  *Voting*:  **The Class 2 Hercules Allowed Secured Claim is Impaired and thus Hercules will be entitled to vote the Hercules Allowed Secured Claim to accept or reject the Plan**.

(19)

3. Class 3:  General Unsecured Claims.

(i) *Classification:*  Class 3 consists of General Unsecured Claims.

(ii) *Description:*    Class 3 General Unsecured Claims are unsecured Claims against the Debtor that are not Administrative Claims, Priority Tax Claims or Other Priority Claims.

**The Debtor estimates that Allowed General Unsecured Claims will total approximately $19,000,000.**

(iii) *Treatment*:  In the event the Liquidation Trustee elects not to pursue any Causes of Action (other than Causes of Action relating to collection of accounts receivable, return of unearned insurance premiums and/or return of deposits), no Distributions shall be made on account of General Unsecured Claims.

In the event the Liquidation Trustee elects to pursue any Causes of Action (other than any Causes of Action relating to collection of accounts receivable, return of unearned insurance premiums and/or return of deposits), as soon as practicable after resolution of all such Causes of Action each holder of an Allowed General Unsecured Claim shall receive its pro-rata portion (taking into account any Disputed Claims Reserves) of (a) the first $1,000,000 of Recovery Funds remaining after payment of all Trust Expenses and any remaining amounts of the Allowed Priority Tax Claims, Allowed Other Priority Claims, Non-Deferred Hercules Claim and Non-Deferred Professional Administrative Claim, (b) fifty percent (50%) of any such Recovery Funds in excess of the said $1,000,000 until the Deferred Hercules Claim and all Deferred Professional Administrative Claims are paid in full, (c) one hundred percent (100%) of all such Recovery Funds in excess of the said $1,000,000 after all Deferred Professional Administrative Claims and the Deferred Hercules Claim are paid in full, and (d) one hundred percent (100%) of all other Liquidation Trust Assets after payment in full of (or reservation for) all other Allowed Claims, including the Deferred Hercules Claim and the Deferred Professional Administrative Claims, and all Trust Expenses.

Notwithstanding anything else in the Plan or the Liquidation Trust Agreement, (a) if the Liquidation Trustee elects not to pursue any Causes of Action (other than Causes of Action related to collection of accounts receivable, return of unearned insurance premiums and/or return of deposits), or (b)  if the Liquidation Trustee determines that it is likely that the Liquidation Trust Assets that will be available for Distribution will be insufficient to generate a recovery of at least one percent (1%) to holders of Allowed General Unsecured (taking into account, among other things, the anticipated cost of resolving objections to General Unsecured Claims and effecting such Distributions), the Liquidation Trustee may elect to Distribute all available Liquidation Trust Assets, after payment of all Trust Expenses, any remaining Allowed Priority Tax Claims and Allowed Other Priority Claims, any remaining Non-Deferred Hercules Claim and any remaining Non-Deferred Professional Administrative Claim and reservation of reasonable amounts for anticipated future Trust Expenses; (x) first, *pari passu* and pro-rata, to Hercules, Stevens & Lee, Pillsbury and Morris Nichols on account of the Deferred Hercules Claim and the Deferred Professional Administrative Claims, respectively, until an amount equal to the Deferred Hercules Claim shall have been distributed to Hercules and the Deferred

Professional Administrative Claims shall have been distributed to Stevens & Lee, Pillsbury and Morris Nichols, and (y) second, any remainder to a non-profit 503(c) organization providing bankruptcy related services to consumer debtors selected by the Liquidation Trustee.

(iv) *Voting*:  The Claims in this Class are Impaired and thus holders of Claims in this Class will be entitled to vote to accept or reject the Plan.

4.  Class 4:  Interests.

(i) *Classification*:  Class 4 consists of the Interests in the Debtor.

(ii) *Treatment*:  The holders of Interests will not receive any Distributions or other consideration on account of such Interests.  On the Effective Date, all Interests shall be cancelled, extinguished, and of no further force and effect.

(iii) *Voting*:  **The holders of Allowed Interests are deemed to have rejected the Plan and, therefore, the holders of Interests are not entitled to vote to accept or reject the Plan**.

## VI.  SELECTED DETAILS REGARDING IMPLEMENTATION OF PLAN

### A.  Liquidation Trust

1.  Appointment of Liquidation Trustee.  The Committee has selected John L. Palmer, the Debtor's current CRO and CEO, to serve as Liquidation Trustee.  The Liquidation Trustee shall have the powers, duties, and obligations set forth in this Plan and in the Liquidation Trust Agreement (which is attached to the Plan as Exhibit "A").  After the Effective Date, all actions required of and/or otherwise specified herein to be performed by the Debtor shall be performed by the Liquidation Trustee, or its designee, in the name of, and on behalf of, the Debtor.  The Liquidation Trustee will be compensated as follows (a) a non-contingent fee equal to $350 per hour, but not more than $20,000 in any twelve (12) month period, plus (ii) a percentage  of all recoveries on account of D&O Causes of Action and Chapter 5 Claims equal to the maximum percentages payable to a Chapter 7 trustee pursuant to Section 326(a) of the Bankruptcy Code at each level of distribution (with the said recoveries treated as if they were Chapter 7 distributions), plus (iii) the reimbursement of all reasonable out-of-pocket expenses incurred in connection with the Liquidation Trust Agreement..

2.  Vesting of Debtor's Assets in the Liquidation Trust.  On the Effective Date, subject only to the terms of the Plan, all Assets of the Debtor, wherever situated, shall vest in the Liquidation Trust, free and clear of all Liens, Claims, encumbrances and Interests except as otherwise provided in the Plan.

3. <u>Duties and Responsibilities of Liquidation Trustee</u>.  On the Effective Date, the Liquidation Trustee shall assume all of the duties and obligations previously undertaken by the Debtor's board of directors and officers that arise after the Effective Date and is empowered and authorized to satisfy such responsibilities, duties and obligations without any further corporate authority as may have been required prior to the Effective Date.  These duties, responsibilities and obligations include, but are not limited to, the following:

(a) Receipt, management, investment, supervision, and protection of the Liquidation Trust Assets, subject to the limitations provided in the Liquidation Trust Agreement.

(b)  Holding of legal title to any and all Liquidation Trust Assets.

(c)  Subject to the applicable provisions of the Plan and this Agreement, collection and liquidation of all Liquidation Trust Assets.

(d)  Review, and where appropriate, objection to claims, and supervision and administration of the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all Disputed Claims and the Distributions to the Beneficiaries and creditors of the Liquidation Trust, in any manner permitted by the Liquidation Trust Agreement, the Plan, and the Confirmation Order or as approved by the Bankruptcy Court.

(e) Commencement, prosecution, compromise, settlement, withdrawal, abandonment or resolution of all Causes of Action in any manner permitted by the Liquidation Trust Agreement, the Plan, and the Confirmation Order or as approved by the Bankruptcy Court.

(f) Payment of all lawful expenses, debts, charges, taxes, and liabilities of the Liquidation Trust.

(g) Making of Distributions to the Beneficiaries, and to creditors of the Liquidation Trust as provided for, or contemplated by, the Plan, the Confirmation Order or the Liquidation Trust Agreement.

(h) Employment and compensation of attorneys, accountants, appraisers, or other parties necessary to assist in the proper administration of the Liquidation Trust, including attorneys, accountants, appraisers, or other parties previously employed by the Debtor, without the necessity of approval of the Bankruptcy Court.

(i) Performance of all administrative functions in the Chapter 11 Case, including the ultimate closing of the Chapter 11 Case.

4. <u>Consultation Rights of Holders of Deferred Professional Administrative Claims and Deferred Hercules Claim</u>.  Until the Deferred Hercules Claim and the Deferred Professional Administrative Claims are paid in full, the Liquidation Trustee, upon reasonable request by any holder of such Claims, shall consult with such holder and respond to its reasonable inquiries and requests for information concerning all non-privileged matters relating to the Liquidation Trust and the implementation of the Plan, including but not limited to the status of litigation, the reasonableness of the fees and expenses incurred by the Trust and the Liquidation Trustee and information relating to income expenses and balances on hand in the Liquidation Trust.

### B.   Nonconsensual Confirmation

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in Section 1126(c) of the Bankruptcy Code, the Debtor reserves the right to amend the Plan or undertake to have the Court confirm the Plan under Section 1129(b) of the Bankruptcy Code or both.  With respect to any Impaired Classes of Claims that are deemed to reject the Plan, the Debtor shall request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.

### C.   Injunctions

Except as otherwise provided in the Plan, the Liquidation Trust Agreement or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Entities that have held, hold or may hold a Claim or other debt or liability against the Debtor or Interest in the Debtor are permanently enjoined from taking any of the following actions against any of the Debtor, the **Committee**, the Liquidating Trustee and/or the Liquidating Trust**,** along with each of their respective present or former affiliates, members, employees, agents, officers, **directors** and principals and professionals on account of any such Claims or Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding against any property transferred to the Liquidation Trust; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any property transferred to the Liquidation Trust; (c) creating, perfecting or enforcing any lien or encumbrance against any property transferred to the Liquidation Trust; (d) asserting a setoff of any kind against any debt, liability or obligation due to the Debtor to the extent such right of setoff was or could have been asserted on or before the applicable bar date on account of any such Claim or Interest; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan on account of any such Claim or Interest; (f) taking any action derivatively on behalf of the Debtor or (g) taking any actions to interfere with the implementation of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.

### D.   Releases

Claim Holders' Release of Claims Against Officers, Directors and Professionals of the Debtor.  As of the Effective Date, each holder of a Claim who votes in favor of the Plan and does not elect to opt out of the releases contained in Section 11.2 of the Plan by making such election on its Ballot, shall be deemed to have released all direct and derivative claims in connection with or related to any action or omission taking place after the Commencement Date and prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case or the Plan against the Debtor's present and former directors, officers, employees, agents, financial advisors, attorneys and professionals (including Tamarack Associates, Inc. and John L. Palmer); provided, however, the foregoing shall not waive or release any causes of action arising out of (i) any contractual obligations owing by any such party or (ii) the willful misconduct, gross negligence, intentional fraud or criminal conduct of any such party..

Claim Holders' Release of Claims Against Committee. As of the Effective Date, each holder of a Claim who votes in favor of the Plan and does not elect to opt out of the releases contained in Section 11.2 of the Plan by making such election on its timely-submitted Ballot, shall be deemed to have released all direct and derivative claims in connection with or related to any action or omission taking place after the Commencement Date and prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case or the Plan against the Committee and its members and any of their respective employees, agents, financial advisors, attorneys and professionals; provided, however, the foregoing shall not waive or release any causes of action arising out of (i) any contractual obligations owing by any such party or (ii) the willful misconduct, gross negligence, intentional fraud or criminal conduct of any such party.

Claim Holders' Release of Claims Against Hercules. As of the Effective Date, each holder of a Claim who votes in favor of the Plan and does not elect to opt out of the releases contained in Section 11.2 of the Plan by making such election on its timely-submitted Ballot, shall be deemed to have released all direct and derivative claims in connection with or related to any action or omission taking place after the Commencement Date and prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case or the Plan against Hercules and its members and any of their respective employees, agents, financial advisors, attorneys and professionals; provided, however, the foregoing shall not waive or release any causes of action arising out of (i) any contractual obligations owing by any such party or (ii) the willful misconduct, gross negligence, intentional fraud or criminal conduct of any such party.

## E.    Exculpation

To the fullest extent provided by applicable law, neither the Debtor, Committee, nor any of their respective members, officers, directors, employees, advisors, agents or Professionals (including Tamarack and Palmer) shall have or incur any liability to any holder of a Claim for any action or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or formulation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, except for willful misconduct or gross negligence; provided, however, that nothing in the Plan shall, or shall be deemed to, release or exculpate such parties with respect to their obligations or covenants arising pursuant to the Plan.

## F.    Reserved

## G.    No Discharge

Because the Plan is a liquidating plan, under 11 U.S.C. Section 1141(d)(3), the Plan does not provide for a discharge of indebtedness.

## H.    Potential Causes of Action

The Debtor has identified the following potential Causes of Action under the Code and applicable non-bankruptcy law:

(i) Causes of Action against entities that received preferential transfers or fraudulent transfers under Section 547 or 548 of the Code;

SL1 1369103v7 109188.00001

(ii)  Causes of Action to recover accounts receivable owed to the Debtor;

(iii)  Causes of Action to recover deposits maintained by the Debtor;

(iv)  Causes of Action to recover unearned insurance premiums;

(v)  Causes of Action against current and/or former directors and officers of the Debtor; and

(vi) Causes of Action under the D&O Policy, including any Causes of Action against the insurer under the D&O Policy related to coverage under the D&O Policy (the "D&O Causes of Action").

The Debtor may supplement this list of potential Causes of Action up through the Effective Date of the Plan.

## VII.  LIQUIDATION ANALYSIS

**Exhibit B** contains a liquidation analysis (the "Liquidation Analysis") reflecting the Debtor's estimate of the realizable value of its assets and the amount of its obligations in the event this Chapter 11 Case were converted to chapter 7.   As reflected in the Liquidation Analysis, in a chapter 7, absent recoveries on account of D&O Causes of Action, no amounts would be available for distribution to holders of Claims other than the Hercules Allowed Secured Claim and Administrative Claims.

## VIII.  VOTING ON THE PLAN

### A.    Voting Procedures

Only Classes of Claims or Interests that are Impaired under the Plan and are not deemed to have rejected the Plan are entitled to vote to accept or reject the Plan.   The only Classes of Claims or Interests that are Impaired under the Plan and are not deemed to have rejected the Plan are Class 1 (the Other Priority Claims), Class 2 (the Hercules Allowed Secured Claim) and Class 3 (the General Unsecured Claims).   Accordingly, only holders of Allowed Claims in Classes 1, 2 and 3 are entitled to vote to accept or reject the Plan.

Because the Hercules Allowed Secured Claim has been Allowed by the Global Settlement Approval Order, Hercules is entitled to vote its Class 2 Claim in the amount of $75,000 plus any balance remaining on the Non-Deferred Hercules Claim as of the Record Date.

Except for Claims expressly Allowed by order of the Bankruptcy Court, Class 1 and Class 3 votes on the Plan will be counted only with respect to Claims:  (a) that are listed on the Debtor's Schedules of Assets and Liabilities, as amended, other than as disputed, contingent or unliquidated; or (b) for which a Proof of Claim was filed on or before the General Claims Bar Date.  However, any vote by a holder of a Claim will not be counted if such Claim has been disallowed or is the subject of an unresolved objection, absent an order of the Bankruptcy Court allowing such Claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a Claim in an Impaired Class is important.  After carefully reviewing the Plan and Disclosure Statement, each holder of such a Claim should vote on the enclosed Ballot either to accept or to reject the Plan, and then return the Ballot by mail to the Debtor's Balloting Agent by the Balloting Deadline.

Any Ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A Ballot that is not received by the Balloting Deadline will not be counted.

If a Ballot is damaged, lost, or missing, a replacement Ballot may be obtained by sending a written request to the Debtor's attorney.

### B.   Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots.

## IX.   CRAM-DOWN

If any Class of Impaired Claims or Impaired Interests does not accept the Plan but: (a) at least one Impaired Class of Claims accepts the Plan, and (b) the Plan complies with all of the plan confirmation requirements of Section 1129(a) of the Bankruptcy Code other than the requirement that all Impaired Classes of Claims and Interests have accepted the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Classes through the "cram-down" provisions of the Bankruptcy Code, but only if the Plan does not "discriminate unfairly" and is otherwise "fair and equitable" to the non-accepting Impaired Classes.

Because Hercules has agreed to vote its Class 2 Claims to accept the Plan, it is not necessary to discuss whether the Plan would satisfy the cram-down requirements as they relate to Class 2.

The Plan cannot be crammed-down on Class 1, the Other Priority Claims.  Such is the case because Section 1129(a)(9)(B)(ii) provides, in relevant part, that if a class of claims entitled to priority under Sections 507(a)(1), (a)(4), (a)(5), (a)(6) or (a)(7) does not accept a plan, then holders of such claims must receive cash on the effective date of the plan equal to the allowed amounts of such claims.  Class 1 of the Plan includes Allowed Claims entitled to priority under the foregoing Sections of the Bankruptcy Code (defined herein as the Other Priority Claims). Unfortunately, the Debtor does not project that it will have enough Cash on hand as of the Effective Date of the Plan to pay all Other Priority Claims in Cash in full on the Effective Date. As a result, in the event Class 1 rejects the Plan, absent changes in projections and/or concessions from holders of Allowed Administrative Claims and an amendment to the Plan, the Debtor will not be able to confirm the Plan if Class 1 rejects.  And, in that case, conversion to Chapter 7 is likely.

It is important to note that the Debtor believes that holders of Other Priority Claims will receive a greater Distribution under the Plan than would be realized if this Chapter 11 Case were

(26)

converted to Chapter 7.  Such is the case because, among other reasons discussed in the Best Interests Test Section of this Disclosure Statement, below, (a) in a Chapter 7 the Other Priority Claims would be junior in priority to the Deferred Professional Administrative Claims and the Deferred Hercules Claim (estimated to total approximately $195,000), while, (b) under the Plan, the Deferred Professional Administrative Claims and the Deferred Hercules Claim are effectively subordinated to the Other Priority Claims.

Based on the foregoing, the ability to satisfy the cram-down requirements will be analyzed only as they apply to Class 3 (the General Unsecured Claims), since that Class may vote to reject the Plan, and Class 4 (the Interests), since that Class is deemed to have rejected the Plan.

### A.    Unfair Discrimination

The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank.  The Plan does not "discriminate unfairly" with respect to Class 3 or Class 4 because neither Class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank, and the treatment under the Plan follows the distribution scheme dictated by the Bankruptcy Code.

### B.    Fair and Equitable Standard

As to all impaired classes of claims or interests, the Bankruptcy Code provides that the fair and equitable test is satisfied if no holder of a claim or interest that is junior to the claims or interests of such class will receive or retain any property under the plan on account of such junior claim or interest.

The fair and equitable test is satisfied as to Classes 3 and 4 because no holder of a Claim or Interest that is junior to the Claims and Interests in such Classes will receive or retain any property under the Plan on account of such junior Claim or Interest.

## X.    BEST INTERESTS TEST

The Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest in such class have accepted the plan or will receive property of a value, as of the effective date of the plan, that is not less than the amount such holder of a claim or interest would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.  This is referred to as the "Best Interests Test."

Because Hercules has agreed to vote the Hercules Allowed Secured Claim to accept the Plan, it is not necessary to discuss whether the Plan would satisfy the Best Interests Test as it relates to the Hercules Allowed Secured Claim.  Rather, the Best Interests Test need only be analyzed as it relates to Claims in Class 1 (the Other Priority Claims) and Class 3 (the General Unsecured Claims) and Interests in Class 4.

As to the holders of Other Priority Claims, the Best Interests Test is satisfied, by definition because, (a) absent the voluntary election by such holders to exercise the Other

(27)

Priority Claim Compromise Election, all such Allowed Other Priority Claims will be paid in full under the Plan, and (b) if this Chapter 11 Case were converted to Chapter 7, the holders of Other Priority Claims could not realize a recovery in excess of the amounts of their Allowed Claims. In fact, as discussed above, it is possible that, if this Chapter 11 Case were converted to Chapter 7, the holders of Allowed Other Priority Claims would receive less than what they will receive if the Plan is confirmed because, (x) if the Plan is confirmed, the Deferred Professional Administrative Claims and the Deferred Hercules Claim (estimated to aggregate approximately $195,000) will be effectively subordinated to the Other Priority Claims, while (y) in Chapter 7, the Deferred Professional Administrative Claims and the Deferred Hercules Claim will be senior in priority to the Other Priority Claims.

As to the holders of General Unsecured Claims, the only objective Best Interests Test variables are (a) the fact that, under the Plan, approximately $300,000 of the Professional Administrative Claims (being the Deferred Professional Administrative Claims) will be effectively subordinated to the Allowed General Unsecured Claims as to the first $1,000,000 of Recovery Funds and, thereafter, will share Recovery Funds with the holders of Allowed General Unsecured Claims while, in a Chapter 7 liquidation, the Deferred Professional Administrative Claims will be senior in priority to the General Unsecured Claims for all purposes, including in connection with distributions on account of Recovery Funds, and (b) the timing of pursuit of the Causes of Action assuming the Plan is confirmed versus the timing of pursuit of such Causes of Action in a Chapter 7.

The Debtor believes that, if the Chapter 11 Case is converted to Chapter 7, the Administrative Claims in the Chapter 7 that will be senior to the General Unsecured Claims will exceed the Administrative Claims that will be senior to the General Unsecured Claims if the Plan were confirmed. Such is the case because: (a) most of the work required of the Professionals to prepare and file the Plan has already have been completed, and (b) in a Chapter 7 liquidation, no portion of the Professional Administrative Claims will be subordinated to, or share with, the General Unsecured Claims in distributions on account of Recovery Funds. In addition, since the Chapter 7 trustee and counsel to the Chapter 7 trustee will be unfamiliar with the Debtor, there will be some time spent by each to "get up to speed," which the Debtor believes will delay the evaluation and possible pursuit of the Causes of Action and, assuming the Causes of Action yield recoveries which allow for Distributions to holders of Allowed General Unsecured Claims, the Debtor believes those Distributions will also be delayed.

Based on the foregoing, the Best Interests Test is satisfied as to holders of General Unsecured Claims.

As to holders of Interests, the Debtor estimates that there will be $19,000,000 in Allowed General Unsecured Claims. As reflected in the Liquidation Analysis (**Exhibit B** hereto), absent the pursuit of Causes of Action and the generation of fairly significant recoveries on account of such Causes of Action, there will be no Distributions to holders of Allowed General Unsecured Claims. Since, in a Chapter 7, nothing would be available for distribution to holders of Allowed Interests until all Allowed General Unsecured Claims have been paid in full, in order for holders of Allowed Interests to receive any distribution in a Chapter 7, something in excess of $19,000,000 in recoveries on account of Causes of Action would have to be achieved. While the Debtor cannot disprove the proposition that the Causes of Action have a value in excess of

$19,000,000, the limited review of the Causes of Action performed by the Debtor and the Committee to date do not support such valuation.

Based on the foregoing, the Best Interests Test is satisfied as to holders of Interests.

The Debtor has worked closely with the Committee as relates to the decision whether to convert this Chapter 11 Case to Chapter 7 or to pursue confirmation of the Plan.  While not determinative for purposes of satisfaction of the Best Interests Test, it is relevant that the Committee (whose constituency is the most directly impacted by the decision) supports confirmation of the Plan and does not want the Chapter 11 Case converted to Chapter 7.

## XI.  FEASIBILITY

The Bankruptcy Code requires that the Court determine that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the debtor. The Plan meets the feasibility standard as this is a Plan of liquidation and there will not be a subsequent liquidation or reorganization after the Effective Date.

## XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans of liquidation under Chapter 11, (b) dismissal of the Chapter 11 Case, or (c) conversion of the Chapter 11 Case to a case under Chapter 7.

### A.  Alternative Plan

The Debtor does not believe that there are any alternative plans.  The Debtor believes that the Plan enables holders of Claims to realize the greatest possible value under the circumstances and that, compared to any hypothetical alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### B.  Liquidation under Chapter 7

If the Plan is not confirmed, the Chapter 11 Case may be converted to a Chapter 7 liquidation case.  For the reasons discussed above, the Debtor does not believe that liquidation under Chapter 7 is a better alternative than confirmation of the Plan.

## XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.  Federal Income Tax Consequences to Holders of Claims

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO OR WRITTEN TO BE USED, AND CANNOT BE USED, BY SUCH HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER**

(29)

THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE PLAN; AND (C) SUCH HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  ALL HOLDERS OF CLAIMS AGAINST IN THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN (NON-US) TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### B.    Federal Income Tax Consequences to Debtor

The Debtor may realize cancellation of debt income to the extent of any debt forgiveness. Such cancellation of debt income is generally excludible from the Debtor's gross income under the bankruptcy exception of Section 108(a)(1)(A) of the Tax Code.  To the extent there is cancellation of debt income, the same would reduce the federal tax attributes of the Debtor, including its net operating loss carry-forwards and the tax bases of its assets on the first day of the Debtor's next tax year.  If cancellation of debt income exceeds these attributes, it would be exempt from tax.

Pursuant to the Plan, all of the Debtor's remaining Assets other than those sold or abandoned prior to the Effective Date will be transferred directly or indirectly (through the Liquidation Trust) to holders of Allowed Claims in liquidation of the Debtor.  For federal income tax purposes, any such Assets transferred to the Liquidation Trust will be treated as described above.

The Debtor's transfer of its Assets pursuant to the Plan will be treated as a taxable disposition of such Assets by the Debtor.  It is not known at the present time whether the transfer of the Debtor's Assets will result in any gain to the Debtor.  If such a transfer results in gain, it is not known at the present time whether the Debtor will have sufficient losses or loss carryforwards to offset that gain.  If the transfer results in gain and the Debtor does not have losses or loss carryforwards to offset that gain, the transfer of such Assets will result in federal income tax liability.

SL1 1369103v7 109188.00001

If a corporation undergoes an ownership change, as defined in IRC Section 382(g), the application of pre-change net operating losses ("net operating losses") to reduce income for any post-change year is limited by IRC Section 382.  The Debtor does not believe that it has undergone an ownership change.

## XIV.    SUMMARY, RECOMMENDATION, AND CONCLUSION

The Plan provides for an orderly and prompt distribution to holders of Allowed Claims against the Debtor.  The Debtor believes that the Plan is in the best interests of all holders of Claims.  For these reasons, the Debtor and the Committee urge that the Plan be accepted.


Dated:  June 2, 2015


                         **BAXANO SURGICAL, Inc.**


                         By:    _/s/ John L. Palmer_____
                              John L. Palmer, President and CEO